IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

```
JAMES P. ABARA,                )
                               )     2:10-cv-01752-GEB-DAD
          Plaintiff,           )
                               )
     v.                        )     ORDER
                               )
ALTEC INDUSTRIES, INC.,        )
                               )
          Defendant.           )
_____)
```

      Defendant moves for summary judgment on each of Plaintiff's claims, arguing that Plaintiff cannot establish a prima facie case of discrimination and, alternatively, that Plaintiff's claims are barred by the affirmative defense of judicial estoppel. (Def.'s Mot. 11:2-12.) Plaintiff opposes the motion, arguing "material issues of disputed fact exist as to each element of each [claim]." (Pl.'s Opp'n 20:8-9.)

**I. LEGAL STANDARD**

      A party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "A fact is 'material' when, under the governing substantive law, it could affect the outcome of the case." Thrifty Oil Co. v. Bank of Am. Nat. Trust & Sav. Ass'n, 322 F.3d 1039, 1046 (9th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). An issue of material fact is "genuine" when "the evidence is such that a reasonable jury

could return a verdict for the nonmoving party." Id.

When the defendant is the moving party and is seeking summary judgment on one or more of a plaintiff's claims,

> [the defendant] has both the initial burden of production and the ultimate burden of persuasion on [the motion]. In order to carry its burden of production, the [defendant] must either produce evidence negating an essential element of the [plaintiff's claim] or show that the [plaintiff] does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. In order to carry its ultimate burden of persuasion on the motion, the [defendant] must persuade the court that there is no genuine issue of material fact.

Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc., 210 F.3d 1099, 1102 (9th Cir. 2000) (citations omitted). If the moving party satisfies its initial burden, "the non-moving party must set forth, by affidavit or as otherwise provided in [Federal] Rule [of Civil Procedure ('Rule')] 56, specific facts showing that there is a genuine issue for trial." T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (citation and internal quotation marks omitted). The "non-moving plaintiff cannot rest upon the mere allegations or denials of the adverse party's pleading but must instead produce evidence that sets forth specific facts showing that there is a genuine issue for trial." Estate of Tucker ex rel. Tucker v. Interscope Records, Inc., 515 F.3d 1019, 1030 (9th Cir. 2008) (citation and internal quotation marks omitted).

Further, Local Rule 260(b) requires:

> Any party opposing a motion for summary judgment or summary adjudication [must] reproduce the itemized facts in the [moving party's] Statement of Undisputed Facts and admit those facts that are undisputed and deny those that are disputed, including with each denial a citation to the particular portions of any pleading, affidavit, deposition, interrogatory answer, admission, or

>  other document relied upon in support of that denial.

If the nonmovant does not "specifically . . . [controvert duly supported] facts identified in the [movant's] statement of undisputed facts," the nonmovant "is deemed to have admitted the validity of the facts contained in the [movant's] statement." Beard v. Banks, 548 U.S. 521, 527 (2006).

> Because a district court has no independent duty to scour the record in search of a genuine issue of triable fact, and may rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment, . . . the district court . . . [is] under no obligation to undertake a cumbersome review of the record on the [nonmoving party's] behalf.

Simmons v. Navajo Cnty., Ariz., 609 F.3d 1011, 1017 (9th Cir. 2010) (citation and internal quotation marks omitted).

Evidence must be viewed "in the light most favorable to the non-moving party," and "all reasonable inferences" that can be drawn from the evidence must be drawn "in favor of [the non-moving] party." Nunez v. Duncan, 591 F.3d 1217, 1222-23 (9th Cir. 2010).

## II. UNCONTROVERTED FACTS

In January 2000, Plaintiff began working at Altec Industries, Inc. ("Altec"). (Def.'s Statement of Undisputed Facts ("SUF") ¶¶ 1, 3.) In 2006, Plaintiff was transferred to the Material Control Department, where he continued to work until his termination on March 15, 2010. Id. ¶ 4. During the final two years of his employment, Plaintiff's job title was Helper Material Control. Id. ¶ 13.

"On April 3, 2006, Plaintiff sustained a work-related injury to his right knee[,]" and on or about April 7, 2006, "Plaintiff filed a workers' compensation claim against Altec." Id. ¶¶ 5-6. "On October 10,

2006, Plaintiff underwent arthroscopic surgery" and returned to work on or about October 23, 2006. Id. ¶¶ 8, 10. "Between the date of Plaintiff's arthroscopic surgery on October 10, 2006, and August 26, 2009, [when Plaintiff underwent right knee total replacement surgery,] the pain in Plaintiff's right knee became progressively worse." Id. ¶¶ 16, 21. On August 26, 2009, the date of Plaintiff's surgery, Plaintiff began a medical leave of absence. Id. ¶ 22. On or about the same date, Debbie Muhl, an Altec Human Resources Representative, provided Plaintiff with a copy of a job description for Helper Material Control. Id. ¶ 20.

On August 4, 2009, prior to his surgery, Plaintiff signed a "Leave of Absence Request" form and applied for disability benefits from the Employment Development Department ("EDD") in connection with his right knee total replacement surgery. Id. ¶¶ 17-18. On August 10, 2009, "Plaintiff's surgeon, Dr. Opfell, signed a document certifying Plaintiff's serious health condition." Id. ¶ 19. "On September 2, 2009, Plaintiff began receiving [EDD] disability benefits in the amount of $534.86 every two weeks." Id. ¶ 23. Plaintiff continued to receive these benefits until September 19, 2010. Id. ¶ 73.

Dr. Arfin Din began treating Plaintiff on April 10, 2006, and became Plaintiff's treating physician on March 19, 2009. (Pl.'s Separate SUF ¶¶ 37-38.) "On December 19, 2009, Dr. Din released Plaintiff to return to modified duty at Altec, with the work restrictions of no lifting/pulling/pushing over 20 pounds, no repetitive bending/twisting, no repetitive climbing, no squatting/kneeling/crawling, and no walking for more than 120 minutes at a time." (Def.'s SUF ¶ 25.) "On or about December 20, 2009, Plaintiff treated with Dr. Din . . . and charted the following[:] . . . Unable to return to full duty at this time because of ongoing treatment. . . . Continue modified duty. Disability paperwork

4

filed . . . ." Id. ¶ 28 (internal quotation marks omitted). "On January 25, 2010, Dr. Din issued a Work Status Report, ordering modified duty for Plaintiff with the work restriction of no lifting/carrying over 35 pounds." Id. ¶ 30.

On February 17, 2010, Muhl and Din engaged in an e-mail exchange, in which Muhl inquired about Plaintiff's condition, asking "do you think he will be able to perform his job duties with no restrictions anytime soon?" Id. ¶ 35. Din responded as follows: Plaintiff "is definitely making progress (very slow). I am hopeful but am not holding my breath. I see he has an [appointment] next week with me. Will update you then." Id. ¶ 36. At Plaintiff's appointment the following week, Din charted the following: "Released essentially almost to full duty, specifically no deep knee bending or kneeling. Otherwise released to his full occupation. He is otherwise now permanent and stationary." Id. ¶ 38. After the appointment, Din "issued a Work Status Report, ordering modified duty for Plaintiff with the work restrictions of no kneeling or deep knee bending." Id. ¶ 39.

On March 4, 2010, Muhl sent two e-mails to Din with a copy of the Helper Material Control job description attached, asking him to "take a look at Plaintiff's job description" and give an opinion as to whether "Plaintiff can safely and without risk of injury perform the essential functions of his job." Id. ¶¶ 41-42. Din responded to the e-mail, stating "Yes, I think he can. . . . I think he wants to be an asset to your company." Id. ¶ 43. On March 5, 2010, Muhl sent Din an e-mail inquiring as follows: "Does [Plaintiff] have any driving restrictions? What exactly is deep knee bending? [C]an he climb up into the trucks if need be? Can he lift the required amount if proper lifting requires you to bend at the knees?" Id. ¶ 45. On March 7, 2010, Dr. Din

5

responded to these inquiries, stating "No driving restrictions. Yes—he can climb into a truck and lift. Deep knee bending is squatting with knees flexed." Id. ¶ 46.

On March 9, 2010, Plaintiff met with Muhl and Tracy Case, Plaintiff's supervisor. Id. ¶¶ 12, 48, 50. After the meeting, Muhl informed Din via e-mail that she had met with Plaintiff and "he was definitely concerned with regards to physical requirements. He feels that he is getting mixed messages as to what his limitations are. He does not want to come back until he gets a clear understanding from you." Id. ¶ 51. Din responded, stating "Sounds good—I think he has an upcoming [appointment], so I will review this with him. I am not sure how motivated he is to return? What are your thoughts?" Id. ¶ 52. Muhl then e-mailed Din to request a phone conversation, and Muhl, Case, and David Payne, Altec's Operations Manager, telephoned Din. Id. ¶¶ 53-54.

On March 12, 2010, Plaintiff treated with Din, and Din issued a new Work Status Report. Id. ¶ 55. "In addition to Plaintiff's permanent work restrictions of no kneeling or deep knee bending, Dr. Din added no lifting/carrying over 50 pounds[,] . . . and released Plaintiff to return to modified duty[.]" Id. On or about March 12, 2010, Plaintiff attempted a deep knee bend in front of Din and almost tipped over. Id. ¶ 56. On March 14, 2010, Din completed a Family Practice Progress Note and sent an e-mail to Muhl stating "Unfortunately,—I don't think he can do the job." Id. ¶¶ 57, 59. "The decision to terminate Plaintiff was made sometime after Muhl received the March, 14, 2010[] e-mail from Dr. Din." Id. ¶ 61. "On March 15, 2010, Plaintiff was discharged from Altec." Id. ¶ 62.

In or about September 2010, a Stipulation with Request for Award in the amount of $55,016.00 was signed. Id. ¶ 74. "On September

20, 2010, Workers' Compensation Administrative Law Judge Esther Volkan approved the Stipulation[] with Request for Award." Id. ¶ 75.

## III. DISCUSSION

Defendant seeks summary judgment on Plaintiff's Americans with Disabilities Act ("ADA") claim, each of Plaintiff's Fair Employment and Housing Act("FEHA") claims, and Plaintiff's wrongful termination in violation of public policy claim. (Def.'s Mot. 11:2-5.) Defendant's basis for seeking summary judgment on each claim is centered on its argument that "Plaintiff was not a 'qualified individual with a disability' covered by the ADA or FEHA, because he could not perform the essential functions of his position of Helper Material Control, with or without reasonable accommodation, and was not qualified for any other available position at Altec." Id. 11:5-8. Further, Defendant argues "Plaintiff's claims are barred by the defense of judicial estoppel, because his argument that he was a qualified individual with a disability contradicts the representations that he and his physicians made to obtain disability and workers' compensation benefits." Id. 11:9-12.

### A. Disability Discrimination

Defendant seeks summary judgment on Plaintiff's ADA and FEHA disability discrimination claims, arguing Plaintiff cannot establish a prima facie case of disability discrimination since "Plaintiff cannot show . . . that he is a qualified individual with a disability and that Altec subjected him to adverse employment action because of his disability." Id. 14:1-4. Plaintiff counters, arguing "Plaintiff was able to perform the essential functions of Plaintiff's position with reasonable accommodation when Defendant terminated Plaintiff's employment." (Pl.'s Opp'n 24:15-17.)

7

1   "When [considering] motions for summary judgment in employment
2   discrimination cases arising under state law, federal courts sitting in
3   diversity must apply the McDonnell Douglas burden-shifting scheme as a
4   federal procedural rule." Zeinali v. Raytheon Co., 636 F.3d 544, 552
5   (9th Cir. 2011) (internal quotation marks and citation omitted). At
6   issue in this motion is the first step of the McDonnell Douglas burden-
7   shifting scheme: "The employee must first establish a prima facie case
8   of discrimination. Id. (internal quotation marks and citation omitted).
9   "At summary judgment, the degree of proof necessary to establish a prima
10  facie case is 'minimal and does not even need to rise to the level of a
11  preponderance of the evidence.'" Jefferson v. Fed. Express Corp., 2010
12  WL 3630984, at *3 (N.D. Cal. Sept. 14, 2010) (quoting Lyons v. England,
13  307 F.3d 1092, 1112 (9th Cir. 2002)).

14          To establish a prima facie case of disability discrimination
15  under both the ADA and FEHA, Plaintiff must show: "(1) he is a disabled
16  person within the meaning of the statute; (2) he is a qualified
17  individual with a disability; and (3) he suffered an adverse employment
18  action because of his disability." Hutton v. Elf Atochem N. Am., Inc.,
19  273 F.3d 884, 892 (9th Cir. 2001); Faust v. Cal. Portland Cement Co.,
20  150 Cal. App. 4th 864, 886 (2007) (requiring a Plaintiff establish the
21  following for a FEHA claim: "(1) he suffers from a disability; (2) he is
22  otherwise qualified to do his job; and, (3) he was subjected to adverse
23  employment action because of his disability").

24          However, "[f]or the purposes of this motion only, [Defendant]
25  concedes that Plaintiff suffers from a right knee disability within the
26  meaning of the FEHA and ADA[.]" (Def.'s Mot. 13:23-27.) Further,
27  Defendant did not respond to the following Statement of Undisputed Fact
28  submitted by Plaintiff: "Defendant also admits that Defendant terminated

Plaintiff because of Plaintiff's disability." (Pl.'s SUF ¶ 178.) Therefore, the only remaining issue in determining whether Plaintiff has established a prima facie case is whether Plaintiff was qualified to do his job.

Plaintiff has the initial burden of demonstrating "that he or she is a qualified individual[.]" Green v. State, 42 Cal. 4th 254, 260 (2007); see also Hutton, 273 F.3d at 892 ("The plaintiff bears the burden of proving that he is qualified."). "The ADA defines 'qualified individual with a disability' as 'an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.'" Hutton, 273 F.3d at 892. Based on Equal Employment Opportunity Commission ("EEOC") guidance, the Ninth Circuit has developed the following two-step inquiry to determine whether an individual is qualified: "the court first examines whether the individual satisfies the 'requisite skill, experience, education and other job-related requirements' of the position . . . [and] then considers whether the individual 'can perform the essential functions of such position' with or without a reasonable accommodation." Bates v. United Parcel Serv., Inc., 511 F.3d 974, 990 (9th Cir. 2007) (quoting 29 C.F.R. § 1630.2(m)).

However, Defendant specifically argues Plaintiff has not produced evidence to show Plaintiff could perform the essential functions of the Helper Material Control position. (Def.'s Mot. 13:21-22; see also Def.'s Reply 1:3-8 ("The evidence is undisputed that Plaintiff was not a qualified individual with a disability under either the . . . ADA or the . . . FEHA, because he could not perform the essential functions of his position of Helper Material Control . . .

1 .").) "The term 'essential functions' refers to the 'fundamental job
2 duties of the employment position the individual with a disability holds
3 or desires.'" Dark v. Curry Cnty., 451 F.3d 1078, 1087 (9th Cir. 2006).
4 Essential functions do not include the marginal functions of the
5 position. Bates, 511 F.3d at 989 (citing 29 C.F.R. § 1630.2(n)(1)). In
6 determining which functions are essential, relevant evidence includes,
7 but is not limited to, the employer's judgment as to which functions are
8 essential, written job descriptions prepared before advertising or
9 interviewing applicants for the job, the amount of time spent on the job
10 performing the function, the consequences of not requiring the incumbent
11 to perform the function, and the past and current work experience of
12 incumbents on the job. Cal. Gov't Code § 12926(f)(2); 29 C.F.R. §
13 1630.2(n).

14 Since "much of the information which determines [the]
15 essential functions lies uniquely with the employer[,]" "an employer who
16 disputes the plaintiff's claim that he can perform the essential
17 functions must put forth evidence establishing those functions." Bates,
18 511 F.3d at 991. In defining the essential functions, Defendant provides

> [b]oth Plaintiff's written job description for the
> position of Helper Material Control . . . and sworn
> statements from . . . [Muhl, Case, Plaintiff's co-
> worker Ben Lawson, and vocational expert Keith
> Wilkinson, which] attest to the fact that
> Plaintiff's position is an arduous warehouse job
> that requires lifting, carrying, and pushing 50
> pounds or more, kneeling, crouching, climbing in
> and out of trucks, squatting to lift from the
> ground level and to replenish . . . maintenance,
> repair, and operations [("MRO")] items on low lying
> shelves, and to restock numerous small metal parts
> in [drawers] only inches above the ground.

26 (Def.'s Mot. 15:5-13.) The written job description for the position of
27 Helper Material Control, dated August 25, 2009, states the following
28 physical demands: "repetitive standing, walking, reaching, bending,

10

crouching, kneeling, twisting, climbing on and off trucks[;] lifting—up to 50 lb[;] carrying—up to 50 lb[; and] pushing/pulling—up to 50 lb." (Case Decl. Ex. 12.)

Further, Defendant provides three declarations in order to explain the essential functions of Plaintiff's job. In Muhl's declaration, she declares:

> I have firsthand knowledge of some of the physical demands of Plaintiff's job of Helper, because I periodically performed his lighter job duties, when he was on his second medical leave of absence, and after he was discharged from Altec. The job duties previously performed by Plaintiff that I have performed include, but are not limited to, clerical work, replenishing small MRO . . . items and numerous small metal parts that Altec stocks in the Materials Department. When performing Plaintiff's job duties, I would need to squat or crouch on the average of 10 to 15 times per day, in order to return materials to low lying shelves and drawers only two inches above the ground.

(Muhl Decl. ¶ 25.) Defendant also produces Case's declaration, in which she avers:

> Plaintiff's job of Helper Material Control is a physically rigorous warehouse position, which includes the essential functions/physical demands of repetitive: lifting, pulling, and pushing 50 pounds or more, crouching, squatting, deep knee bending, twisting, climbing on and off trucks, standing[,] walking, reaching, and bending. Plaintiff was required to lift 50 pounds or more from the ground up, using safe lifting practices (i.e. squatting), and on a daily basis moved truck parts onto shelves, carts, and pallets. Plaintiff was also required to push and pull carts with truck parts weighing 50 pounds or more from production horseshoe, where the trucks are built, to the area where the parts are stored a significant distance away. Plaintiff was also required to lift from the ground up, and pull/push truck parts weighing over 50 pounds when restocking unused parts and discarding defective parts. Plaintiff was also required to consolidate truck parts weighing 50 pounds or more on pallets and unmovable shelves only a few inches above the floor, and restock small MRO . . . items in drawers only two inches above the ground. Plaintiff was also required to climb on and off of trucks as a recurrent function

11

1
2
          of his job and, when necessary, operate the green
outside forklift which requires users to negotiate
a high step when mounting the forklift. . . .

(Case Decl. ¶ 6.) Defendant also provides the declaration of Ben Lawson, Plaintiff's coworker at Altec, who declares:

> Plaintiff's job title was Helper Material Control which, not unlike my duties of Material Control Coordinator, is an arduous and labor intensive warehouse job, requiring such repetitive physical demands as lifting/pushing/pulling up to and exceeding 50 pounds, standing, walking, reaching, bending, crouching, kneeling, climbing, and squatting to engage in safe lifting practices.
>
> . . .
>
> Although I too, perform Plaintiff's lighter duties, I regularly perform Plaintiff's more rigorous job duties, such as lifting parts weighing up to 50 pounds or more, pulling/pushing carts with truck parts weighing in excess of 50 pounds, returning unused truck parts to stock . . ., and moving extremely heavy hose rolls. When returning parts to low lying unmovable shelves . . ., which occurs on multiple occasions in a given day, it is necessary to squat to return the parts to their proper places. It would be very easy for me to throw-out [sic] my back, if I failed to squat, while lifting and/or returning a truck part weighing 25 pounds or more, to a low lying shelf, or when working with the rolls of hose.
>
> In performing Plaintiff's former job duties, I estimate that I need to squat between 20 and 40 times per day . . . . In addition, I sometimes need to climb on and off of trucks, as well as climb a ladder to return unused parts to their proper places.
>
> . . .
>
> Plaintiff was required to work with hoses and hydraulic fittings, approximately two to three times per week . . . . The hose rolls weigh approximately 156 pounds and I am informed and believe that they require 65 pounds of pulling or pushing pressure to lift up one edge of it . . . . Additionally, in order to pull or push the roll to this position, I need to partially squat.
>
> . . .

12

> On a given day, although not every day, when performing Plaintiff's Helper duties, I estimate that: (a) approximately 20% to 60% of my day is spent lifting up to 75 pounds; (b) approximately 40 to 50% of my day is spent carrying up to 75 pounds; and (c) less than 20% of my day is spent pushing up to 75 pounds.
>
> Overall, I would describe Plaintiff's former Helper Material Control job duties as repetitive, rigorous, physically demanding, and laborious.

(Lawson Decl. ¶¶ 2-7.)

Defendant also produces the declaration and vocational report of its expert, Keith Wilkinson, who avers:

> Based on my analysis, it is my expert opinion that Plaintiff's Helper position was a physically demanding and labor intensive warehouse job. The position required repetitive physical demands, including lifting/pushing/pulling up to and sometimes exceeding 50 pounds, standing, walking, reaching, bending, crouching, kneeling, climbing, and squatting to engage in safe lifting practices.
>
> . . .
>
> Based on my analysis, it is my opinion that Plaintiff could not perform the job duties of Helper without repetitively lifting/pushing/pulling up to 50 pounds or more on a daily basis, and repetitively kneeling and/or squatting, to reach low lying shelves, and to engage in safe lifting practices.

(Wilkinson Decl. ¶¶ 8, 13; see also Baron Decl. Ex. 16, 2-4.)

In response, Plaintiff argues Defendant's evidence does not accurately demonstrate the essential functions of Plaintiff's actual position at Altec. (Pl.'s Opp'n 23:20-24:14.) In support of this argument, Plaintiff provides deposition testimony from which a reasonable inference could be drawn that the essential functions of his job comprised administrative tasks rather than physical labor.

Plaintiff disputes the accuracy of the Helper Material Control written job description in detailing Plaintiff's actual position, arguing "the 'physical demands' portion of Plaintiff's job description

13

1  was cut and pasted from a job description at Defendant's corporate
2  offices that pertained to production and material control associates
3  working at [the] corporate [office]." Id. 6:25-7:1. In support of this
4  argument, Plaintiff provides Muhl's deposition testimony, in which she
5  explains that the "[p]hysical demands came from [Altec's] corporate
6  office for production associates and material control associates." (Muhl
7  Dep. 76:17-21.) Muhl also avers that no one from corporate "ever
8  monitor[ed Plaintiff] in his position to determine if his job required
9  these physical demands." Id. 76:22-25. Further, Plaintiff produces
10 deposition testimony indicating that no one at Altec examined or made
11 direct observations regarding how many times each day or week Plaintiff
12 spent engaging in tasks that required lifting, pulling, or pushing over
13 20 pounds; squatting, kneeling, or crawling; and repetitive bending and
14 twisting. (Case Dep. 144:14-145:17; 148:2-149:18; Muhl Dep. 118:15-18,
15 154:7-10; Payne Dep. 63:11-23.) Case averred that if he needed to,
16 Plaintiff could "avoid doing tasks that would call for deep-knee bending
17 or squatting." (Case Dep. 107:15-18.) Muhl gave deposition testimony
18 that she did not know one way or the other "whether and to what extent
19 [Plaintiff] perform[ed] all of these tasks [listed on the written job
20 description]." (Muhl Dep. 77:9-11.)

21        Plaintiff also argues "a major component of Plaintiff's final
22 position with Defendant was as an MRO Buyer[,]" and that Plaintiff
23 engaged in many administrative tasks that did not require rigorous
24 physical activity. Id. 6:8. In support of this argument, Plaintiff
25 produces the deposition testimony of Case, who avers the "two major
26 components" of Plaintiff's job were "MRO buyer, basically, which is any
27 materials that aren't charged to the truck. So it's small items. . . .
28 And then the next largest task was helping me with inventory

disbursement; obsolete inventory, I should say." (Case Dep. 72:9-19.) As Case explained in her deposition, reordering the MRO parts does not involve lifting. Id. 156:12-19. Case also testified that checking MRO supplies to be replenished was "probably the most stable thing he was supposed to do." Id. 76:8-77:9. Case averred Plaintiff worked at his desk when "he reordered parts when he did order materials that needed to be replenished." Id. 77:17-25. Further, Case gave deposition testimony that one of Plaintiff's daily tasks was to issue tools to the shop, in which he "would be the one to log—engrave on the tool and then log what that person got and handle the tools." Id. 86:11-17.

Further, Plaintiff argues in his opposition brief that he "was qualified to continue performing all of the essential functions of Plaintiff's position without accommodation." (Pl.'s Opp'n 22:2-5.) Plaintiff provides support for this argument in his Separate Statement of Undisputed Facts, to which Defendant does not respond. (Pl.'s Separate SUF ¶¶ 76-110.) Therefore, since Plaintiff's produced evidence is sufficient to establish a prima facie case and to create a genuine issue of material fact on the issue whether Plaintiff could perform the essential functions of the job he held, Defendant's motion for summary judgment on Plaintiff's disability discrimination claims is denied.

**B.   Failure to Provide a Reasonable Accommodation**

Defendant also seeks summary judgment on Plaintiff's failure to provide a reasonable accommodation claim, arguing it "fails because [Plaintiff] is not a qualified individual with a disability and, in any event, Altec did not fail to accommodate his disability." (Def.'s Mot. 22:8-10.) FEHA proscribes an employer from "fail[ing] to make reasonable accommodation for the known physical or mental disability of an . . . employee." Cal. Gov't Code § 12940(m). "The elements of a failure to

1 accommodate claim are (1) the plaintiff has a disability under FEHA, (2) the plaintiff is qualified to perform the essential functions of the position, and (3) the employer failed to reasonably accommodate the plaintiff's disability." Scotch v. Art Inst. of Cal.-Orange Cnty., Inc., 173 Cal. App. 4th 986, 1009-10 (2009).

Since a genuine issue of material fact exists regarding the essential functions of the job Plaintiff held at the time of his termination, Defendant's motion for summary judgment on Plaintiff's failure to provide a reasonable accommodation claim is denied.

### C. Failure to Engage in the Interactive Process

Defendant also seeks summary judgment on Plaintiff's failure to engage in the interactive process claim, arguing, *inter alia*, "there is no triable issue of fact" since "Altec engaged in an ongoing interactive process with Plaintiff and Dr. Din concerning Plaintiff's functional limitations and work restrictions . . . [, and] a reasonable accommodation to enable Plaintiff to return to work did not exist[.]" (Def.'s Mot. 23:9-27.) Plaintiff responds, arguing "Defendant failed to engage in even one of the four mandatory steps of the interactive process." (Pl.'s Opp'n 30:19-20.)

FEHA imposes a duty on the employer "to engage in a timely, good faith, interactive process with the employee . . . [for the purpose of] determin[ing] effective reasonable accommodations, if any, in response to a request for reasonable accommodation by an employee . . . with a known physical or mental disability . . . ." Cal. Gov't Code § 12940(n). "The interactive process requires communication and good-faith exploration of possible accommodations between employers and individual employees with the goal of identifying an accommodation that allows the employee to perform the job effectively." Dep't of Fair Emp't

16

& Hous. v. Lucent Techs., Inc., 642 F.3d 728, 742-43 (9th Cir. 2011) (quoting Nadaf-Rahrov v. Neiman Marcus Grp., Inc., 166 Cal. App. 4th 952, 83 (2008)). The first step of the interactive process "begins with a description of the particular job involved." Nadaf-Rahrov, 166 Cal. App. 4th at 987 (emphasis omitted).

Since a genuine issue of material fact exists regarding the essential functions of the job Plaintiff held at the time of his termination, Defendant's motion for summary judgment on Plaintiff's failure to engage in the interactive process claim is denied.

**D.  Wrongful Termination in Violation of Public Policy**

Defendant also seeks summary judgment on Plaintiff's wrongful termination in violation of public policy claim, arguing it "fails as a matter of law because this claim is factually and legally identical to Plaintiff's [claims] under the ADA and FEHA for disability discrimination." (Def.'s Mot. 24:6-8.) Plaintiff counters, arguing "Defendant has violated Plaintiff's rights, and terminated Plaintiff's employment, in violation of both the ADA and the FEHA." (Pl.'s Opp'n 31:8-9.)

"To state a prima facie wrongful discharge claim, a plaintiff must establish: (1) an employer-employee relationship; (2) that plaintiff's termination was a violation of public policy; (3) causation; and (4) damages." Ujagar v. Campbell's Soup Co., No. CIV. S-05-674 LKK/DAD, 2006 WL 3762106, at * 6 (E.D. Cal. Dec. 20, 2006)(citing Holmes v. General Dynamics Corp., 17 Cal. App. 4th 1418, 1426 n.8 (1993)). Disability discrimination in violation of FEHA is a "violation of public policy" upon which a common law tort claim for wrongful discharge can be based. City of Moorpark v. Sup. Ct., 18 Cal. 4th 1143, 1159-61 (1998)).

Since "summary judgment [is denied] as to [Plaintiff's ADA and

FEHA disability] discrimination claim[s,] . . . summary judgment as to the wrongful termination [in violation of public policy] claim is also inappropriate." Ujagar, 2006 WL 3762106, at *7. Therefore, this portion of Defendant's summary judgment motion is denied.

### E. Judicial Estoppel

Alternatively, Defendant argues "Plaintiff's disability discrimination claims are barred by the defense of judicial estoppel." (Def.'s Mot. 19:20-21.) Plaintiff counters, arguing the judicial estoppel defense based upon application and receipt of disability benefits does not bar a disabled employee's claims under FEHA or the ADA. (Pl.'s Opp'n 32:13-22.)

Judicial estoppel is a doctrine that "precludes litigants from asserting inconsistent positions in different forums." Fredenburg v. Contra Costa Cnty. Dep't of Health Serv., 172 F.3d 1176, 1179 (9th Cir. 1999). "Federal law governs the application of judicial estoppel in federal courts." Johnson v. Oregon, 141 F.3d 1361, 1364 (9th Cir. 1998). The Ninth Circuit has not only "rejected a per se rule" regarding the application of judicial estoppel, but has also stated there is a "clear preference . . . that inconsistent statements simply be considered along with other evidence to see whether they were so damaging that no rational trier of fact could rule in the plaintiff's favor." Fredenburg, 172 F.3d at 1179. Therefore, "[j]udicial estoppel applies when a party's position is tantamount to a knowing misrepresentation to or even fraud on the court." Johnson, 141 F.3d at 1369.

"Where, as here, the *moving party* bears the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." Houghton v. South, 965 F.2d 1532, 1536 (9th Cir. 1992). Defendant argues "[b]y

accepting workers' compensation and disability benefits, Plaintiff has benefitted from his physicians' representations that he cannot fulfill the essential functions of his job. Allowing Plaintiff to pursue an ADA or FEHA claim as a qualified individual would allow Plaintiff to hold, and benefit from, inconsistent positions." (Mot. 21:1-5.) In support of this argument, Defendant produces the Altec Leave of Absence form filed by Plaintiff prior to his surgery in which Plaintiff marked the following category as the reason for the leave of absence: "A serious health condition that makes you unable to perform the essential functions of your job." (Muhl Decl. Ex. 17.) Defendant also relies upon Plaintiff's uncontroverted workers' compensation claim and receipt of disability benefits. (Def.'s Mot. 19:22-20:17.)

However, Defendant's evidence is insufficient to satisfy its burden of showing that Plaintiff's position concerning his workers' compensation claim, in the situation here where his employer concluded he could not do his job, is tantamount to committing fraud on the court. Therefore, Defendant's motion for summary judgment on its affirmative defense of judicial estoppel is denied.

### IV. CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is DENIED.

Dated: December 22, 2011

GARLAND E. BURRELL, JR.
United States District Judge